IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

JEFFREY L. BOWMAN,

             Plaintiff,

v.                                            Civil Action No. 1:09CV137
                                                     (Keeley)

MICHAEL ASTRUE, COMMISSIONER OF
SOCIAL SECURITY,

             Defendant.


## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain

judicial review of a final decision of the Commissioner of Social Security ("Commissioner")

denying his claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits

("DIB") under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-

433, 1381-1383f.   The matter is awaiting decision on "Plaintiff's Motion to Remand or,

alternatively, Motion to Supplement Court Transcript" [Docket Entry 10]; Plaintiff's Motion for

Summary Judgment [Docket Entry 11];  Defendant's Motion for Summary Judgment [Docket Entry

12]; and Defendant's Motion for Summary Judgment [Docket Entry 14],[1]  and has been referred to

the undersigned United States Magistrate Judge for submission of proposed findings of fact and

recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

## I.  Procedural History

Jeffrey L. Bowman ("Plaintiff") filed applications for DIB and SSI on January 31, 2005,

---

[1]Defendant necessarily filed a second Motion for Summary Judgment in response to
Plaintiff having filed a Motion to Remand and a subsequent Motion for Summary Judgment.

alleging disability beginning February 6, 2001 (R. 29).[2]  Both applications were denied initially and

on reconsideration (R. 6, 27).  Plaintiff requested a hearing, which Administrative Law Judge

("ALJ") Mark O'Hara held on May 22, 2007 (R. 842).  Bowman, represented by counsel, testified,

as did his ex-wife and a vocational expert ("VE").  By decision dated July 27, 2007, the ALJ denied

benefits (R. 39).  The Appeals Council denied Plaintiff's request for review August 6, 2009, making

the ALJ's decision the final decision of the Commissioner (R. 6).

## II.  Motion to Remand or, Alternatively, Motion to Supplement Court Transcript

As a threshold matter, the undersigned considers "Plaintiff's Motion to Remand, or

alternatively, Motion to Supplement Court Transcript."  In his Motion, Plaintiff notes that he had

filed a previous application for DIB in August 2001.  That claim was denied on February 5, 2003,

after an ALJ hearing.  Plaintiff did not pursue the claim any further.  The ALJ's decision of February

5, 2003, was therefore final.  Plaintiff's counsel states that at the hearing regarding his current

application, counsel "specifically requested retrieval and reopening of the prior DIB claim file and

association of that file with the current claim.  Counsel had also requested reopening and association

of the file in a pre-hearing memorandum."

Plaintiff argues that his longitudinal medical history is not only relevant "but critical for

making full, informed decisions on the current claim.  By failing to retrieve and associate the prior

---

[2]

The Court notes that Defendant filed a previous application on September 14, 2001 (protective filing
date August 28, 2001), also alleging disability beginning February 6, 2001, which was denied
initially, on reconsideration, and by an unfavorable decision by an Administrative Law Judge on
February 5, 2003 (R. 46).  Plaintiff asserts that the filing of this second application should have been
reopened pursuant to 20 CFR §§ 404.988 and 404.989 and corresponding regulations governing
Title XVI claims.  Counsel has moved that the prior claim file be associated with the current claim
for purposes of insuring a decision based upon the entire medical record (R. 12).  This is the subject
also of Plaintiff's Motion to Remand, which shall be addressed in this Opinion.

claim file with the current application, the ALJ could not address the reopening issue and did not consider all evidence available and applicable to the claim. On its face this error warrants remand."

Defendant filed a Motion for Summary Judgment in response to Plaintiff's Motion to Remand, representing to the Court that the ALJ in the current case determined that grounds for reopening the prior claim had not been established. Defendant argues there is no factual or legal basis for remanding this case for association with the previous case or for supplementing the record with the prior claim file.

Defendant also argues that there is no need to supplement the record because the current record contains evidence from the period adjudicated by the prior ALJ. Additionally, it is possible to track the evidence upon which the prior ALJ relied with specific citations to the record.

The undersigned first notes that Plaintiff provides no legal basis for his Motion to Remand or to Supplement the Record. The decision in the prior claim was final as of February 2003. Although noting counsel had moved to reopen the prior claim, the ALJ expressly denied that motion, and Plaintiff sets out no legal basis to support a reopening in the motion. 20 CFR § 416.1488 provides:

> A determination, revised determination, decision, or revised decision may be reopened –
> (a) Within 12 months of the date of the notice of the initial determination, for any reasons;
> (b) Within two years of the date of the notice of the initial determination if we find good cause . . . to reopen the case; or
> (c) At any time if it was obtained by fraud or similar fault . . . . ,

The decision in Plaintiff's prior claim was clearly more than two years before the requested reopening, and Plaintiff has not shown it was obtained by fraud or similar fault. The Court does not have jurisdiction to review a final decision of the Secretary not to reopen a claim for benefits except

in very limited circumstances, where a claimant presents a "colorable constitutional claim." Holloway v. Schweiker, 724 F.2d 1102 (4th Cir. 1984)(citing Califano v. Sanders, 430 U.S. 99, 97 S. Ct. 980 (1977). Plaintiff does not argue he has a colorable constitutional claim, and the undersigned finds none.

Additionally, a review of the record in the current case shows that evidence going as far back as 1996 is included, as is the prior ALJ's decision from 2003. The undersigned finds, as Defendant argues, it is possible to track the evidence upon which the first ALJ based his decision.

For all the above reasons, the undersigned recommends Plaintiff's "Motion to Remand or, alternatively, Motion to Supplement Court Transcript" [Docket Entry 10] be **DENIED**.

Defendant also contends that Plaintiff failed to comply with the Local Rules of this Court by filing his Motion for Remand and then, two weeks later, a separate Motion for Summary Judgment. L.R.Gen.P. 83.12(b) provides:

> Within thirty days after the defendant has filed an answer and a complete copy of the administrative record, the plaintiff shall file a brief in support of his or her claim(s) for relief.

Defendant argues that when a party fails to raise an issue in its opening brief, the issue is waived, citing Buffington v. Baltimore County, et al., 913 F.2d 113 (4th Cir. 1990). The undersigned agrees with Defendant that by filing two separate motions, Plaintiff has caused unnecessary effort and some confusion. Defendant was forced to submit two separate responses to the two separate motions. The undersigned also agrees that the Motion to Remand could have been included in the Motion for Summary Judgment. Finally, there have been numerous instances in which a Plaintiff has requested supplementation of the record and a continuance or extension of time to file his or her motion for summary judgment, many of which have been granted, without moving for remand of the case.

The undersigned notes, however, that counsel for Plaintiff did not argue any substantive claims regarding his disabilities in the Motion to Remand. The Fourth Circuit has "long adhered to the sound public policy of deciding cases on their merits . . . . and not depriving . . . parties of their fair day in court." Choice Hotels Intern., Inc., v. Goodwin and Boone, 11 F.3d 469 (4th Cir. 1993)(internal citations omitted). The undersigned finds that disallowing Plaintiff's Motion for Summary Judgment to go forward on the merits would be far too great a penalty, and chooses to address the substantive issues on the merits.

For the above reasons, the undersigned recommends Defendant's Motion to Strike Plaintiff's Motion for Summary Judgment and his own Motion for Summary Judgment [Docket Entry 12] be **DENIED**.

### III. Statement of Facts

Jeffrey L. Bowman ("Plaintiff") was born March 21, 1956, and was 44 years old on his alleged onset date, February 6, 2001 (R. 12). He was 51 years old when he testified at the video hearing held on May 22, 2007. He is a high school graduate, served in the Marines, and worked as a heavy equipment mechanic, "having received on-the-job training" (R. 40).

### A. The Prior ALJ Decision

Having already found that the February 5, 2003, was a final decision, the relevant period in this case begins on that date. Any evidence prior to that date is cited for background purposes only.

In the 2001 claim, Plaintiff alleged he had been disabled since February 6, 2001, due to a seizure disorder, severe chronic low back pain, mid-back pain, and severe neck pain (R. 49). At the first step of the sequential evaluation process the ALJ found Plaintiff had not engaged in substantial gainful activity at any time pertinent to his adjudication. At the second step, the ALJ found Plaintiff

had medically-determinable impairments including degenerative disc disease of the spine with a disc herniation at the L4-L5 level; history of seizure activity; knee derangement; and status post multiple surgeries to his right knee (R. 54). The ALJ also noted Plaintiff had a history of a sprained right ankle; a syncopal episode for which he was hospitalized for three days in 1999; some double and blurred vision after being struck on the head with a baseball in 2000, which was diagnosed as a mild concussion; significant difficulties with his right knee from time to time; and a history of seizures of unknown etiology of one year duration (R. 50). The ALJ found each of these impairments alone or in combination, were "severe."

At the third step, the ALJ determined that Plaintiff did not have any impairment or combination of impairments that satisfied or equaled any of the listings. The ALJ in particular included discussion of listings 11.02 and 11.03 relating to epilepsy with seizures and 1.04 relating to back pain.

At the fourth step the ALJ determined that Plaintiff was not fully credible and his symptoms, including pain, were overstated. He noted the medical evidence did not reflect much seizure activity at all and certainly not since the alleged onset date.

The ALJ found Plaintiff had the residual functional capacity ("RFC") to perform light work activity, provided he be permitted to alter his position between sitting and standing at least every 30 minutes, and that he not be exposed to unprotected heights or dangerous moving machinery nor to work that would require climbing ladders, ropes or scaffolds or more than occasionally balancing, stooping, kneeling, crouching or crawling. He must be able to use a cane if required to walk more than 200 yards.

The ALJ also determined that Plaintiff's limitations prevented him from performing any of

his past relevant work (R. 53). He could, however, perform other jobs that were available in significant numbers in the national economy, and was therefore not disabled through February 5, 2003, the date of the decision.

## B. Records Subsequent to the Prior Decision

Between May 17, 2002, and November 23, 2003 (R. 546-573), Dr. Trenbath treated the Plaintiff for exacerbation of chronic low back pain with known lumbar radiculopathy secondary to herniated disc and foraminal hypertrophy; seizure disorder; right knee pain; and depression which was helped by Prozac. Plaintiff was treated with OxyContin but switched to Duragesic patch and Hydrocodone (R. 558). On July 24, 2002, Dr. Jackson, a treating physician at Gassaway Emergency Room called Dr. Trenbath who verified that the Plaintiff had told him the truth about his back pain and that Dr. Trenbath did "not think there is any unusual things going on there" (R. 570). There is a note on August 28, 2003, that indicates Plaintiff was "bit by snake" (R. 548).

On September 8, 2004, Plaintiff reported to Dr. Trenbath with chronic low back pain and a seizure disorder. He had a State DHHR form for the doctor to fill out. Dr. Trenbath stated: "The patient has known multilevel DDD and I doubt if he can work so I filled out the DHHR form." Plaintiff was given a shot of Demerol and Phenergan (R. 544).

Plaintiff was seen at the hospital on September 20, 2004. His back "went out" two weeks earlier and he fell and injured his left leg and left arm. The leg was now okay but he continued to have pain in the left forearm (R. 273). X-rays were taken of the left hand and left forearm. There were no fractures, dislocations, or bone lesions seen and no radiographic abnormality (R. 272).

Between October 29, 2004, and July 8, 2005, Dr. Trenbath treated Plaintiff for left shoulder bursitis; neck and low back pain; marked wasting of the bicep muscle on the left; depression;

possible cancer of the liver; and thyroid nodule.  He found Plaintiff was "cachectic,"[3] and had lost a lot of weight (R. 531-543).

Plaintiff was seen on consult from Dr. Trenbath by Paul Conley, D.O., on November 16, 2004, for his complaints of  abdominal pain, rectal bleeding and weight loss (R. 333).

A CT scan of the abdomen and pelvis taken at Summersville Memorial Hospital on November 23, 2004, revealed two lesions at the left lobe of the liver (R. 332).

A liver mass on CT of the abdomen was seen on November 23, 2004 and liver ultrasound was performed on December 10, 2004.  The ultrasound revealed a 2.7cm hypoechoic lesion at the tip of the left lobe of the liver and a smaller 2.2 cm hyperechoic lesion at the left lobe probably representing a hemangioma, but "[t]he possibility of metastatic disease cannot be excluded."  (R. 328).

Due to weight loss and abdominal pain, a colonoscopy was performed on December 3, 2004, and revealed scattered diverticula, spastic sigmoid colon, slight hiatal hernia, and mild gastritis (R. 331).

Plaintiff arrived via ambulance and was seen in the emergency department of Webster County Memorial Hospital on  December 30, 2004, complaining of left arm and neck pain, associated with shortness of breath with chest pain becoming more severe over the past couple of hours (R. 287).  An x-ray of the chest revealed no acute cardiopulmonary changes (R. 278).  Plaintiff was transferred to United Hospital Center  for direct care and further cardiac testing not available at Webster County Memorial Hospital (R. 274).

A chest x-ray was taken on December 30, 2004, and showed no abnormalities in the heart

---

[3]Cachexia– weight loss, wasting of muscle, loss of appetite, and general debility that can occur during a chronic disease.  The American Heritage Stedman's Medical Dictionary (2002).

or lungs (R. 312). A CT thorax with contrast was also taken on the 30th. It revealed an 8 mm nodule on the lower pole of the right lobe of the thyroid. No pulmonary embolism or mediastinal adenopathy was detected. A CT scan and a tagged red blood cell scan of the liver were recommended to evaluate the lesions (R. 313).

Plaintiff was seen December 30, 2004, by Dr. James L. Whittle who opined the Plaintiff's history was not consistent with angina. He discontinued intravenous nitroglycerin and noted if Plaintiff's troponins were negative he would discontinue the heparin (R. 316).

Plaintiff was seen December 31, 2004, by Dr. Mark Hrko for a thyroid nodule and weight loss (R. 306). A thyroid sonogram was taken and revealed dominant complex nodule, lower pole right lobe, corresponding with CT finding (R. 309).

A fine needle aspiration biopsy and aspiration of fluid within the complex right thyroid nodule noted at the lower pole was performed without complication on January 3, 2005. It is noted in an addendum dictated by Dr. C. Goodwin on January 7, 2005, that "Cytologic results indicate no evidence of cancer." (R. 298).

An anterior cervical diskectomy was performed on January 4, 2005, by Dr. Richard Douglas, who reported:

> The patient is a 48-year-old white male who several days ago presented to United Hospital Center with neck and left arm pain. Thought to be cardiac in origin. Cardiology worked the patient up and felt it was a non-cardiac pain. Then the patient underwent a cervical magnetic resonance imaging which revealed a large left C5-C6 herniated disk. The patient was quite uncomfortable and did not want to undergo cervical epidural steroid injections for trying to control his pain and was not receiving adequate analgesia from parenteral medications.

(R. 310).

A pathology report prepared by Gerald Wedemeyer dated January 5, 2005, revealed a diagnosis of intervertebral disc (C5-6) - consistent with herniated nucleus pulposus (R.296).

On January 12, 2005, Plaintiff was seen in follow-up by Richard Douglas, M.D., status post anterior cervical discectomy and foraminotomy at C5-6 with Allograft and cervical plating which was performed on January 6, 2005. Plaintiff had no complaints of arm pain and his staples were removed. Plaintiff was to return on January 17, 2005 for wound check and to obtain x-rays of his cervical spine (R. 351).

Plaintiff was seen on follow-up for his scope with Paul J. Conley, D.O., on January 18, 2005, and the liver mass that was seen on cat scan and ultrasound. Plaintiff had chronic back pain and was given a shot of Nubain and Phenergan. A PET scan was scheduled (R. 327).

On February 2, 2005, Plaintiff was seen by Richard Douglas, M.D., status post anterior cervical discectomy and foraminotomy at C5-6 with Allograft and cervical plating which was performed on January 6, 2005. Cervical x-rays revealed the plate to be flush against the anterior cervical spine. Plaintiff was doing well and was to return in six weeks with repeat cervical spine x-rays (R. 349). An x-ray of the cervical spine was performed at United Hospital Center on February 2, 2005 and compared to the previous study dated January 5, 2005. The film revealed stable radiographic appearance (R. 350).

Plaintiff was seen on follow-up with Paul J. Conley, D.O., on February 15, 2005, complaining of back pain and pain in his left shoulder. He had an abnormal mass of the thyroid that was going to be removed in Clarksburg but stated he preferred to have the procedure performed closer to where he lived. He was unable to have an MRI due to having medical rods in his neck. Plaintiff was given a shot of Nubain. A CT scan of the left shoulder would be scheduled as well as

an evaluation by Dr. Short (R. 325).

A CT of the left shoulder was taken at Summersville Memorial Hospital on February 18, 2005, and found to be normal. There were no significant findings (R.324).

A PET scan was taken at Greenbrier Valley Medical Center on February 24, 2005. There were no suspicious abnormalities (R. 323).

Plaintiff was seen on follow-up with Paul J. Conley, D.O., on March 10, 2005. He went over his PET scan which revealed no gross abnormalities of the liver. "Due to the fact these (lesions) are probably hemangiomas and is usually not metastatic disease, he is seeing Dr. Yancy Short for his thyroid but I do not feel that his thyroid is an issue due to the fact his pathology was benign." Plaintiff was given a shot of Nubain for pain but was told he would not be given any further injections and that he needed to follow-up with Dr. Trenbath for pain and Dr. Short for his thyroid (R. 322).

A thyroid sonography was performed at United Hospital Center on April 20, 2005. The thyroid gland was within normal size limits but minimally larger than on the previous exam. There was no change in the right thyroid nodules, with the largest in the right lower pole and no nodules identified on the left (R. 334).

On April 25, 2005, a State agency reviewing psychological consultant completed a Psychiatric Review Technique form ("PRT") (R. 380-393). He found the medical and non-medical evidence partially credible and found Plaintiff's depression disorder did not satisfy the diagnostic criteria for a listing as it resulted in only mild restrictions of activities of daily living, mild difficulties maintaining social functioning, mild difficulties maintaining concentration, persistence or pace and no episodes of decompensation of extended duration (R. 390).

On April 27, 2005, a State agency reviewing physician completed a Physical Residual Functional Capacity Assessment ("RFC") (R. 339-346).   The physician opined that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently; could stand/walk at least 6 hours in an 8-hour workday, and could sit about 6 hours in an 8-hour workday.  He could occasionally climb ladders, ropes or scaffolds and could occasionally perform all other postural movements.   Based on the medical and non-medical information in the record, Plaintiff was found to be partially credible and could perform the exertional demands of light work (R. 345).

On May 19, 2005, Plaintiff was seen by Richard Douglas, M.D.,  status post anterior cervical discectomy and foraminotomy at C5-6 with Allograft and cervical plating which was performed on January 6, 2005.   X-rays of the lateral cervical spine revealed the plate to be flush against the anterior cervical spine.  "He is doing well except for approximately two weeks ago he states he had what he states was a seizure while he was sitting at his table."  He said he had  a history of seizures since 1999 and was currently on Dilantin.  Dr. Douglas referred him to Dr. Navada, a neurologist, for his history of seizures and adjustment of medication (R. 347).  An x-ray of the cervical spine was performed at United Hospital Center on May 19, 2005 and compared to the previous study dated February 2, 2005.  The film revealed stable anterior fusion at the C5-6 level with no complications (R. 348).

Plaintiff treated with psychologist Michael D. Morello, M.S., from August 8, 2005 , to March 14, 2006.  He reported chronic pain, depression,  and anxiety symptoms.  He reported being hopeless and worried about his son in Iraq and relying on his father for financial support.  Plaintiff said he would consider psychiatric hospitalization after his birthday and after getting results from an assessment on his neck (R. 466-477).

On  August 31, 2005, Plaintiff reported to Dr. Trenbath that his left shoulder hurt and he

needed a pain shot (R. 526). Dr. Trenbath also performed a State Department of Human Resources physical and completed the form (R. 529). He noted that Plaintiff would be following up with Dr. Conley for his liver and Dr. Douglas, a neurosurgeon, for his neck, as well as a psychiatrist or a psychologist.

On March 13, 2006, Dr. Trenbath reported Plaintiff had: (1)Chronic low back pain with right lumbar radiculopathy; (2) Marked limitation of range of motion of his neck; (3) Left shoulder bursitis; (4) Severe depression; (5) Seizure disorder; and (6) History of some type of thyroid mass removed. He gave Plaintiff a shot of Demerol and Phenergan as well as a shot in the subacromial space of the left shoulder to help with his bursitis (R. 510).

On March 20, 2006, Dr. Trenbath examined Plaintiff for his neck and back pain and found he had a high Dilantin level and low FTI. Dr. Trenbath diagnosed hypothyroidism, toxic Dilantin level, and chronic neck and low back pain. Dr. Trenbath stated: "I am going to check another Dilantin level today and check a Free T4 level to make sure that indeed he has hypothyroidism before starting him on therapy" (R. 507).

On March 21, 2006, Fulvio R. Franyutti, M.D., a State agency reviewing physician, completed a Physical Residual Functional Capacity Assessment (R. 394-401). Dr. Franyutti opined that plaintiff could lift 20 pounds occasionally and 10 pounds frequently; could stand/walk at least 6 hours in an 8-hour workday; and could sit about 6 hours in an 8-hour workday. He had limited range of motion of the left shoulder and was status post cervical discectomy. He could never climb ladders, ropes or scaffolds and could occasionally perform all other postural movements. Based on the medical and non-medical information in the record, Plaintiff was found to be credible. Dr. Franyutti agreed with the earlier ALJ decision. He reduced his RFC to light. (R. 399).

In a "To Whom it May Concern" letter dated April 7, 2006, Richard Trenbath, M.D., advised

13

that the Plaintiff suffered from a seizure disorder and it "is not safe for him to operate a motor vehicle at this time." (R. 499)

On April 28, 2006, Larry J. Legg, M.A., a licensed psychologist, performed a Neuropsychological Screening Profile of Plaintiff for the WV Disability Determination Service (R. 402-408). Plaintiff indicated his primary problem at the time of this evaluation was his physical problems, reporting having a bad back since 1991. His secondary presenting problem was his depression. His medications included Duragesic; Mirtazapine; Prevacid; Hydrocodone/APAP; Fluoxetine; Diazepam; and Phenytoin. He had been seeing a psychologist, Mike Morello, for the past three months but had never before received mental health services or been hospitalized for psychiatric reasons before then. Testing indicated the Plaintiff functioned within the average range of intelligence. Mr. Legg diagnosed Major Depressive Disorder, recurrent, severe, without psychotic features.

On May 9, 2006, Miraflor G. Khorshad, M.D., prepared a report for the West Virginia Disability Determination Section after his evaluation of Plaintiff on May 3, 2006 (R. 410 - 415). Plaintiff's complaints and functional limitations included: he could not drive a vehicle due to his seizures; he could not t bend over or stoop because of back problems; he had constant neck pain; he could not lift due to shoulder pain; he could not walk nor stand; he did not want to be around people; and he could not concentrate (R. 410).

Dr. Khorshad observed Plaintiff was 50 years old, was 5'10" tall, and weighed 167 pounds. He had a normal gait with no assistive device and he was able to get on and off of the examining table. He was able to do the heel toe maneuver but was unable to sit and squat fully because of right knee pain. Dr. Khorshad diagnosed Post Laminectomy Syndrome, Cervical Spine; Chronic pain; Somatoform Disorder; and "History of Seizure (?) (Note: There is no EEG records)." He

14

summarized Plaintiff's complaints as follows:

> This is a 50 year old white male who is seen for an initial disability evaluation. He completed a 12ᵗʰ grade level of schooling. He worked as a heavy equipment mechanic x 23 years. He served in the Marine Corps x 3 years. His last date of employment was in February 2001.

> He admits his first compensable injury to the right knee in 1986 after falling down the steps. He states that had surgical repair in 1986. He had another surgery done in 1996. He complains of persistent pain and tendency for the knee to give out which he attributes to his back pain.

> He had a compensable back injury in 1991 after lifting a 100 lb. hydraulic pump. He admits constant pain of the lumbar area. He was diagnosed with herniated disc. He has been treated by a chiropractor. He also was seen at the Pain clinic and received 2 trigger point injections which he claims made his pain worse. He admits that any movement such as sitting for about 10 minutes aggravates the pain. He describes it as a stabbing pain which radiates to both legs.

> He states that he fell off from some steps and fractured his cervical spine and had a surgical repair. He admits left shoulder pain which he describes as a dull pain which radiates down to his left arm but the pain becomes sharp when he moves his left arm. He admits sharp pain in his neck all of the time.

> He admits a history of seizure in 1999. He has been taking Dilantin. He describes his symptoms as being nauseated and then he passes out for about 3 to 12 hours.

> He states he was hit by a baseball on his occipital area about 3 years ago. Since that time, he admits headache.

> He admits depression x 6 years since he has been off from work. He has been on Prozac x 3 years. He admits suicidal ideation but Prozac seems to help him. He also sees a therapist once a week.

Dr. Khorshad recommended an EEG and a referral for psychiatric evaluation for better treatment of depression (R. 413).

On May 15, 2006, James Capage, Ph.D., a State agency psychologist, completed a Psychiatric Review Technique ("PRT") and found the Plaintiff did not have a severe mental impairment (R. 416- 429).

On May 16, 2006, Dr. Fulvio R. Franyutti, a State agency reviewing physician, completed

a Physical Residual Functional Capacity Assessment (R. 430-437). Dr. Franyutti opined that plaintiff could lift 20 pounds occasionally and 10 pounds frequently; could stand/walk at least 6 hours in an 8-hour workday, and could sit about 6 hours in an 8-hour workday. "The claimant has a history of C5-C6 disc herniation and is S/P discectomy. There is weakness of the left upper extremity, but fine manipulation is normal. The claimant's gait is normal." He could never climb ladders, ropes or scaffolds and could occasionally perform all other postural movements. Based on the medical and non-medical information in the record, Dr. Franyutti found Plaintiff's reported limitations at least partially credible (R. 435).

On June 28, 2006, Plaintiff reported to Dr. Trenbath with complaints of bad headaches. He stated he had had a few seizures and he cut his Dilantin back to three (3) a day. Dr. Trenbath assessed him with (1) chronic low back pain; (2) seizure disorder; and (3) hypothyroidism on replacement therapy. "The patient needs to go back to Morgantown to see the neurologist that he saw before. I think his lawyer asked him to do that." Plaintiff was given a shot of Toradol, Demerol, and Phenergan (R. 493).

On July 6, 2006, Paul J. Conley, D.O. examined the Plaintiff and scheduled a follow-up CT scan of the abdomen "to check for stable hemangioma vs malignancy" (R. 642).

On July 24, 2006, Cynthia Hagan, MA, Supervised Psychologist and Michael Morrello, M.S., Licensed Psychologist, prepared a Psychological Evaluation at the request of Plaintiff's counsel for assessment of anxious and depressive symptoms (R. 438).[4] They diagnosed Plaintiff with Major Depressive Disorder, Recurrent, Severe, and Generalized Anxiety Disorder, and assessed

---

[4]Mr. Morello was Plaintiff's treating psychologist.

his GAF as 56.[5]

The psychologists opined Plaintiff should be referred to a psychiatrist to assess the need for medications. His current medications included: Duragesic, Hydrocodone, Diazepam, Dilantin, Prevacid, Prozac and Mitrazapine (R. 440).

> His cognitive functioning was measured within the Average range. His achievement scores were below his ability level. His personality profiled [sic] collaborates his self-report. Assessments indicate that he is experiencing a severe amount of depression and anxiety.

Plaintiff's physical complaints were right knee pain, herniated discs and bulging discs in the lower back, neck pain, left arm pain, tumor on his liver, and a tumor on thyroid gland. The psychologists opined Plaintiff might benefit from stress management skills and counseling to address his depressive and anxious conditions (R. 445).

Upon referral by Dr. Trenbath, Plaintiff was seen by Dr. John E. Brick at University Health Associates - Neurology on August 3, 2006, for his seizures. He reported his seizures started in 1999. "He relates them to being bit [sic] by a rattlesnake that he picked up behind his house, but the seizures started about three months after this rattlesnake bite." Plaintiff did not go to the doctor for the snake bite. He reported having several "little" and "big" seizures a month. He was taking Dilantin, Duragesic patches, Hydrocodone, Diazepam, Prozac, and a sleeping pill. Dr. Brick opined Plaintiff had a history of seizure disorder and back/neck pain. He ordered an MRI scan of the head and an EEG as well as blood work (R. 716).

A CT of the abdomen with contrast was taken at Summersville Memorial Hospital on August

---

[5]A GAF of 51-60 indicates **Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflict with peers or coworkers). Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

28, 2006, and compared to the previous CT of the abdomen done on November 23, 2004 and the liver ultrasound done on December 10, 2004. "Impression: Stable, probably benign, lesions in the liver unchanged since November 23, 2004. The larger lesions at the left lobe may represent adenoma and/or hemangioma" (R. 644).

On November 21, 2006, Plaintiff reported to Dr. Trenbath that he still had chronic neck pain, back pain, and his legs and left arm hurt all of the time. He still had headaches and seizures for which he took Dilantin. He gave Dr. Trenbath a list of when his seizures occurred and the doctor renewed his prescription for Duragesic Patches and gave him a shot of Demerol, Phenergan, and Toradol. Plaintiff reported that his depression was getting better because his son had come home from Iraq (R. 481).

Dr. Trenbath prepared a report based on his physical examination of the Plaintiff on February 19, 2007, for the West Virginia Department of Health and Human Resources. He concluded Plaintiff could not work due to the constant pain in his neck and low back (R. 637-639). Plaintiff again provided a list of the dates/times of his seizures and severe headaches to Dr. Trenbath (R. 647).

On March 29, 2007, Plaintiff reported to Dr. Trenbath that he had "some type of a seizure yesterday." He stated it was the worst seizure he ever had but did not go to the ER. Dr. Trenbath felt Plaintiff needed to see a neurologist. He also noted the Plaintiff was still losing weight and had left shoulder bursitis (R. 650-65). Plaintiff again provided a list of the dates/times of his seizures and severe headaches to Dr. Trenbath (R. 652).

Dr. Trenbath completed a Primary Physician Questionnaire on May 15, 2007. He diagnosed chronic neck and back pain as well as thyroid tumor. It was his professional opinion that the Plaintiff was not capable of performing any full-time job eight hours per day, five days a week on

a sustained basis (R. 655-666).

During the administrative hearing held on May 22, 2007, Plaintiff testified that he was divorced but still lived with his ex-wife in a one-story house that they owned outright. He had a 29-year-old son in the Army. Plaintiff did not have a driver's license due to his seizure disorder, and his ex-wife took him to doctor appointments in his son's car (R. 851-852).

Regarding his typical day, Plaintiff testified he usually went to bed before 7:00 p.m. and woke up about 2:00 a.m. with headaches. He watched TV and tried to make himself get off of the couch. On a nice day he tried to go out in the yard and watch the birds for 10-15 minutes. He rarely ate breakfast or lunch but usually ate supper. He did not drink alcohol and had never smoked. He testified he could not read because he would get confused and couldn't keep track (R. 867-868).

Plaintiff testified he used to be 6' tall but thought he may have shrunk an inch due to his back problems. He weighed 160 but would like to weigh 190. He started dropping weight about a year earlier and did not know why (R. 850-851). He was currently on a Duragesic patch, Hydrocodone, Diazepam, Dilantin for seizures, Prozac for depression, and Mirtazapine for sleep. He testified his medications made him drowsy and nauseous (R. 863).

Plaintiff testified he was last employed as a heavy equipment manager for McWhorton and Son Construction Company in February of 2001 for about eight months. He hurt his back while working there and received temporary benefits from Workman's Compensation. Prior to that he was employed by Cecil Walker for 23 years as a heavy equipment mechanic until he was laid off. He had no income at the present time and borrowed money from his father. He received food stamps (R. 855-856). Plaintiff felt his back, right knee, neck, left shoulder, left arm, hand, and wrist as well as his seizures and medications were the conditions that most kept him from working (R. 857).

Plaintiff testified he saw neurologist Brick for his seizure disorder and headaches. He was

to see him again in July (R. 859). He also saw psychologist Morello ever week. Plaintiff testified he had the headaches about every other day, and they sometimes lasted all day and night. He took Advil but was going to ask his doctor to give him migraine medication. He testified he generally had seizures two, three or four times a month, but sometimes had them day after day (R. 861). Dr. Trenbath was following him for his seizures. He had seen Dr. Brick who had scheduled an MRI but Plaintiff's medical card had denied it.

Plaintiff testified he did not do housework, cooking, laundry or shopping, but it appeared from his testimony that he had never performed these household tasks, as his wife did them (R. 866). He did no yard work or handyman-type work. He used to go to church, but had not in a few years due to not being able to sit still.

Plaintiff testified he had had two car accidents in 1999, that he attributed to seizures, although he did not know it at the time (R. 875). Plaintiff's ex-wife testified that when he had a seizure he would become confused, feel sick to his stomach, and become disoriented. Sometimes he passed out and then slept (R. 884-885). He remained asleep from two to three hours, to all day. She believed he had the seizures generally about two or three times a month, but sometimes more.

The ALJ then asked the Vocational Expert ("VE") if there would be any jobs available in the national economy for a hypothetical individual of Plaintiff's age and education and work experience, who would be able to perform a range of light work with no climbing ladders, ropes, or scaffolds; only occasional balancing, stooping, crouching, kneeling and crawling; and no exposure to workplace hazards like heights or dangerous moving machinery. The VE testified that there were jobs in the economy the hypothetical individual could do (R. 894).

The ALJ then added the limitation that the individual must avoid concentrated exposure to temperature extremes and vibration; could only occasionally reach overhead with he left arm; and

would need a sit/stand option. The VE testified there would still be a significant number of jobs available (R. 895).

If the hypothetical person could do sedentary work, would need to avoid exposure to hazards and temperature extremes and vibration, and could only occasionally reach overhead with his left arm, he could still perform work that existed in significant numbers in the national economy (R. 897).

The ALJ's Decision was entered on July 17, 2007 (R. 45).

### Evidence Submitted to the Appeals Council

Following the ALJ's Decision, Plaintiff, through counsel, submitted new medical evidence to the Appeals Council (R. 764).

On June 28, 2007, Dr. Trenbath saw Plaintiff for followup (R. 806). On examination, Plaintiff moved slowly and stiffly. His right knee was painful and his neck had limited range of motion. Although Dr. Trenbath reported positive straight leg raising at 90 degrees, this result is considered negative by Social Security. Dr. Trenbath diagnosed seizure disorder, hard to control; chronic neck pain; chronic back pain with left lumbar radiculopathy; right knee pain; and constipation.

On August 4, 2007, Plaintiff presented to the emergency room with a chief complaint of having had a seizure while walking, which caused him to fall in the lake (R. 779). Friends got him out of the lake, but Plaintiff then started having chest pains. He was brought to the ER. Dr. Mark Wantz reported that Plaintiff had "a known history of grand mal seizures and has about 4 to 5 per month despite being therapeutic and is Dilantin [sic]. He does see a seizure specialist but currently they only have him on Dilantin." Dr. Wantz also reported Plaintiff was on "chronic doses of narcotics" for "his known history of chronic back pain." Plaintiff was admitted to the hospital.

On discharge three days later, Plaintiff was diagnosed with chest pain (myocardial infarction ruled out); seizure disorder, grand mal seizure prior to admission; and chronic pain (R. 782). A CT scan performed at the hospital for seizures was normal (R. 796).

On August 30, 2007, Dr. Trenbath reported Plaintiff had had another seizure and hit his left knee fairly badly, as well as his head and hand (R. 816). The knee had quite a bit of swelling. Dr. Trenbath diagnosed internal derangement of the left knee; contusion of the right hand; contusion of the forehead; seizure disorder; and chronic neck pain.

Upon presenting to neurologist Brick, Plaintiff was placed in the hospital for six days for monitoring (R. 826). According to Dr. Trenbath, "[a]pparently he said they didn't really find much but he is still on Dilantin 4 a day and a recent level was 16.3."

On December 31, 2007, Plaintiff was seen in the emergency department of Webster County Memorial Hospital with acute chronic lower back pain (R. 24 D). He was given Demerol and Phenergan and discharged on the same date.


### III.  Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ made the following findings:

1.  The claimant met the insured status requirements of the Social Security Act through December 31, 2005.

2.  The claimant has not engaged in substantial gainful activity since February 6, 2001, his alleged disability onset date (20 CFR 404.1520 (b), 404.1571 *et seq*., 416.920 (b) and 416.971 *et seq.*)

3.  The claimant has the following severe combination of impairments: degenerative disc disease of the cervical and lumbosacral spine as well as depression (a non-severe impairment) (20 CFR 404.1520(c) and 416.920(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the requirements of any of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work (lift or carry 20 pounds occasionally and 10 pounds frequently, stand or walk about 6 hours in an 8-hour workday, and sit about 6 hours in an 8-hour workday) except that he cannot climb ladders, ropes, or scaffolds; he can only perform the other postural activities occasionally (climbing stairs or ramps, balancing, stooping, kneeling, crouching and crawling); he is to avoid all exposure to workplace hazards (e.g., moving machinery or unprotected heights); he is to avoid concentrated exposure to temperature extremes and vibration; he is to limit his overhead reaching with the upper extremities to occasionally; and he is to be accommodated with a sit/stand option.

6.     The claimant is unable to perform any past relevant work (20CFR 404.1565 and 416.965).

7.     The claimant was born on March 21, 1956, and was 44 years old, which is defined as a younger individual age 18-49, on his alleged disability onset date; he is presently 51 years of age and is considered closely approaching advanced age (20 CFR 404.1563 and 416.963).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560 (c), 404.1566, 416.960 (c), and 416.966).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from February 6, 2001 (concurring with the prior ALJ decision that the claimant was not disabled through the date of that decision, February 5, 2003) through the date of this decision (20 CFR 404.1520 (g) and 416.920 (g)).

(R. 32-44).

## IV.  Contentions

A.     Plaintiff contends:

    1.     The ALJ erred by failing to reopen the prior claim and by further failing to request, obtain and associate the prior claim file with the current claim.

    2.     The ALJ erred by failing to consider all of the plaintiff's severe impairments documented in the record.

    3.     The ALJ erred by failing to evaluate the Plaintiff's L4-5 disc herniation and the residuals from the surgery on the C5-6 disc herniation under Listing 1.04.

    4.     The ALJ erred by failing to consider the plaintiff's seizure disorder as "severe" and evaluating that condition under Listing 11.02.

    5.     The ALJ erred by disregarding the opinions of the treating physician, Dr. Trenbath.

    6.     The ALJ did not properly apply SSR 96-7p.

    7.     The substantial evidence does not support the ALJ's finding for a light RFC.

B.     The Commissioner contends:

    1.     Plaintiff has failed to meet his burden of showing that he met Listings 1.04 or 11.02.

    2.     Dr. Trenbath's conclusory and unsupported opinion was not entitled to deference.

    3.     The psychologist's report was not supported by the record.

    4.     Plaintiff's medications did not produce serious functional limitations.

    5.     Substantial evidence supports the ALJ's decision that Plaintiff could perform a limited range of light work.

## V. Discussion
### A.  Scope of Review

24

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" Hays, 907 F.2d at 1456 (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Reopening of Prior Claim

Plaintiff first argues that the ALJ erred by failing to reopen the prior claim and by further failing to request, obtain and associate the prior claim file with the current claim. The undersigned has already discussed this argument, and has already found substantial evidence supports the ALJ's refusal to reopen the prior claim or to request, obtain, and associate the prior claim file with the current claim.

### C. Social Security Acquiescence Ruling ("AR") 00-1(4)

As a threshold matter, the undersigned notes that even though the ALJ was not required to reopen the prior claim or associate the prior claim file with the current claim, he was required to consider the prior ALJ's findings as evidence and accord those findings appropriate weight. Plaintiff raises this issue indirectly in his second argument; however, the undersigned believes this issue is dispositive of the case.

Acquiescence Ruling 00-1(4) provides, in pertinent part:

> When adjudicating a subsequent disability claim arising under the same or a different title of the Act as the prior claim, an adjudicator determining whether a claimant is disabled during a previously unadjudicated period must consider such a prior finding as evidence and give it appropriate weight in light of all relevant facts and circumstances. In determining the weight to be given such a prior finding, an adjudicator will consider such factors as: (1) whether the fact on which the prior finding was based is subject to change with the passage of time, such as a fact relating to the severity of a claimant's medical condition; (2) the likelihood of such a change, considering the length of time that has elapsed between the period previously adjudicated and the period being adjudicated in the subsequent claim; and (3) the extent that evidence not considered in the final decision on the prior claim provides a basis for making a different finding with respect to the period being adjudicated in the subsequent claim.

ALJ O'Hara, the adjudicator in the present case, quoted AR 00-1(4), and correctly stated the requirements in the third paragraph of his Decision. At the end of that paragraph, however, he noted only:

> The prior ALJ found that the claimant retained the residual functional capacity to do light work with some postural and environmental restrictions and was not disabled because he was capable of performing other jobs that exist in significant numbers in the regional or national economy.

(R. 30). He also stated in his step four (RFC) determination:

> In determining the residual functional capacity stated above, the undersigned has afforded considerable weight to the prior decision of ALJ McDougall dated February 5, 2003 . . . in light of the fact that the evidence of record does not document significant changes (except for cervical surgery that was deemed successful) in the claimant's medical condition since that decision.

(R. 42).

At the second step of the sequential evaluation, however, the prior ALJ found Plaintiff had degenerative disc disease of the spine with a disc herniation at the L4-5 level, history of seizure activity, knee derangement, and is status-post multiple surgeries to his right knee. ALJ O'Hara, however, found at the second step that Plaintiff had only degenerative disc disease of the cervical and lumbosacral spine as well as depression (a non-severe impairment). He does not state what weight, if any, he accorded the prior ALJ's step two determination. He does not in his decision indicate that he considered the factors required by the Ruling. He does not discuss whether the Plaintiff's disc herniation, knee derangement, and history of seizure activity were subject to change with the passage of time, the likelihood of such a change or the extent that evidence not considered in the final decision on the prior claim provided a basis for making a different finding. In fact, as already noted, he stated that the evidence did not document significant changes in Plaintiff's medical condition since that decision.

ALJ O'Hara did make express findings that "[t]he prior ALJ noted that claimant overstated his symptoms . . . , which is still true in the present case" (R. 40) and "[l]ike the prior ALJ, the undersigned rejects Dr. Trenbath's multiple conclusory opinions that the claimant is unable to work" (R. 42). In a footnote to AR 00-1(4), SSA notes that subsidiary findings, such as a finding concerning the credibility of a claimant's testimony or statements [or the weight accorded his treating physician], do not constitute findings that are required at a step in the sequential evaluation process and therefore do not fall under the requirement that they be accorded appropriate weight.

The undersigned finds that this error alone requires remand pursuant to Fourth Circuit law and Acquiescence Ruling 00-1(4).

## D. Severe Impairments

Plaintiff argues that the ALJ erred by failing to consider all of his severe impairments documented in the record. As already found, ALJ O'Hara did not follow the requirements of AR 00-1(4). Therefore his step two finding that Plaintiff's only severe impairments were degenerative disc disease of the lumbar and cervical spine is not supported by substantial evidence.

Regarding Plaintiff's history of seizure disorder, found to be a severe impairment by the previous ALJ, ALJ O'Hara found it not to be a severe impairment "because he has not had a recent EEG and seizures have not been confirmed by diagnostic testing; he has seen only two neurologists; and Dr. Brick, his current neurologist, has not been able to help the claimant obtain a medical card" (R. 37). Documentation of seizures by EEG has not been required under the Regulations since 2002, however. Instead, 11.00A for epilepsy, provides as follows:

> In epilepsy, regardless of etiology, degree of impairment will be determined according to type, frequency, duration, and sequellae of seizures. At least one detailed description of a typical seizure is required. Such description includes the presence or absence of aura, tongue bites, sphincter control, injuries associated with the attack, and postictal phenomena. The reporting physician should indicate the extent to which description of seizures reflects his own observations and the source of ancillary information. Testimony of persons other than the claimant is essential for description of type and frequency of seizures if professional observation is not available. Under 11.02 and 11.03, the criteria can be applied only if the impairment persists despite the fact that the individual is following prescribed epileptic treatment.

Here Plaintiff's ex-wife testified she observed many seizures and provided a detailed description. Plaintiff's treating physician diagnosed seizures, referred Plaintiff to neurologists, and prescribed Dilantin, from 1999 to the present. The neurologists also diagnosed Plaintiff with at least a history of seizures. The ALJ does not explain how the neurologist's failure to obtain a medical card for Plaintiff is evidence that Plaintiff did not have seizures. The undersigned therefore finds the ALJ's reasoning for finding Plaintiff's history of seizures to be a non-severe impairment is insufficient, and

not supported by substantial evidence.

Similarly, ALJ O'Hara expressly noted that an 2001 MRI revealed disc herniation at L5-S1, and a 2002 MRI revealed some nerve root compression related to L5-S1 herniation, yet did not find Plaintiff had a severe impairment of disc herniation.

Although the ALJ found Plaintiff did have a medically determinable major depressive disorder, he found it was non-severe. Plaintiff's treating physician diagnosed him with depression. According to the ALJ's own Decision, Michael Morrello, a psychologist who treated Plaintiff from January 31, 2005 until March 14, 2006, opined Plaintiff had chronic depression and anxiety (R. 34). A State agency examining psychologist also diagnosed Plaintiff with depression. On July 24, 2006, Mr. Morrello performed a psychological evaluation of claimant, diagnosing recurrent severe major depressive disorder, generalized anxiety disorder, and GAF of 56. Although the ALJ states that the psychologists performed a psychological evaluation of the claimant at the request of his attorney, it is significant that these were also his treating psychologists. "Although it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it." Craig v. Chater, 76 F. 3d 585, 589 (4th Cir. 1996). The treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Mitchell v. Schweiker, 699 F.2d 185 (4th Cir. 1983). The ALJ did not state what weight he accorded the treating psychologists' opinion. He also did not explain what "persuasive contradictory evidence exist[ed] to rebut it."

For all the above reasons, the undersigned finds substantial evidence does not support the ALJ's step two finding that Plaintiff's only severe impairment was degenerative disc disease of the back and neck.

## E.  Listing 1.04

Plaintiff next argues that the ALJ erred by failing to evaluate the Plaintiff's L4-5 disc herniation and the residuals from the surgery on the C5-6 disc herniation under Listing 1.04. Defendant contends that Plaintiff has failed to meet his burden of showing that he met Listing 1.04. In Cook v. Heckler, 783 F.2d 1168 (4th Cir. 1986), the Fourth Circuit held that an ALJ must identify the relevant listed impairments.   He should then compare each of the listed criteria to the evidence of the claimant's symptoms.   "Without such an explanation, it is simply impossible to tell whether there was substantial evidence to support the determination."  Id.   The undersigned has already found that substantial evidence does not support the ALJ's determination that Plaintiff did not have a severe impairment of disc herniation at the L4-5 level.  MRI's showed disc herniation at that level as well as in the cervical spine.  In the paragraph regarding his evaluation of the Listings, the ALJ does not discuss the 1.00 listings.  He discusses only the seizure listings.  Listing 1.04 concerns disorders of the spine, including degenerative disc disease and herniated nucleus pulposes, both of which were evidenced in the record.  There was also evidence of nerve root compression.  The undersigned finds that Plaintiff's spinal impairment was therefore a relevant listed impairment.  The ALJ was therefore required to identify that impairment and compare the listed criteria to the evidence of Plaintiff's symptoms.  "Without such an explanation, it is simply impossible to tell whether there was substantial evidence to support the determination."  Cook, supra.

## F.  Listing 11.02

Plaintiff next argues the ALJ erred by failing to consider the plaintiff's seizure disorder as "severe" and evaluating that condition under Listing 11.02. Defendant contends that Plaintiff has failed to meet his burden of showing that he met Listing 11.02.   As already stated, the undersigned finds substantial evidence does not support the ALJ's determination that Plaintiff's "history of

seizures" was not a severe impairment. Listing 11.02 (convulsive epilepsy) requires documentation by detailed description of a typical seizure pattern including all associated phenomena; occurring more frequently than once a month in spite of at least 3 months of prescribed treatment, with daytime episodes (loss of consciousness and convulsive seizures) or nocturnal episodes manifesting residuals which interfere significantly with activity during the day. Listing 11.03 (nonconvulsive epilepsy) requires documentation by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment with alteration of awareness of loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day. Pt. 404. Subpt. P., App.1.

The undersigned finds Plaintiff's alleged seizure disorder is a relevant listed impairment. The ALJ was therefore required to identify that impairment and compare the listed criteria in 11.02 and 11.03 to the evidence of Plaintiff's symptoms. Again, "[w]ithout such an explanation, it is simply impossible to tell whether there was substantial evidence to support the determination." Cook, supra.

## G. Dr. Trenbath's Opinion

Plaintiff next argues the ALJ erred by disregarding the opinions of the treating physician, Dr. Trenbath. Defendant contends Dr. Trenbath's conclusory and unsupported opinion was not entitled to deference. It is undisputable that Dr. Trenbath was Plaintiff's treating physician. "Although it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it." Craig v. Chater, 76 F. 3d 585, 589 (4th Cir. 1996). The treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the

31

patient's condition over a prolonged period of time."  Mitchell v. Schweiker, 699 F.2d 185 (4ᵗʰ Cir.

1983).

20 C.F.R. § 404.1527 states:

(d) *How we weigh medical opinions*.  Regardless of its source, we will evaluate every medical opinion we receive.  Unless we give a treating  source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion

(1) *Examining relationship*.  Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2) *Treatment relationship*.  Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(I) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion.  We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(I) *Length of the treatment relationship and the frequency of examination*.  Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion.  When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

(ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability.* The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. . . .

(4) *Consistency.* Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(Emphasis added).

The ALJ correctly states that the treating physicians' opinions that Plaintiff is disabled are "determinations reserved for the Commissioner." 20 CFR 404.1527 provides:

(e) *Medical source opinions on issues reserved to the Commissioner.* Opinions on some issues, such as the examples that follow, are not medical opinions, as described in paragraph (a)(2) of this section, but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; *i.e.,* that would direct the determination or decision of disability.

(1) *Opinions that you are disabled.* We are responsible for making the determination or decision about whether you meet the statutory definition of disability. In so doing, we review all of the medical findings and other evidence that support a medical source's statement that you are disabled. A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled.

(2) *Other opinions on issues reserved to the Commissioner.* We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to this subpart, your residual functional capacity (see §§404.1545 and 404.1546), or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

Therefore Dr. Trenbath's opinion that Plaintiff meets listing 11.02, or that he must work at the sedentary level is not entitled to controlling weight. Dr. Trenbath, however, also opined that Plaintiff had headaches, sleep disturbance, a seizure disorder, chronic low back pain, chronic knee pain, a thyroid problem, left shoulder pain, and depression. He opined that Plaintiff could stand for 15 minutes at a time and sit for 15 minutes at a time, and must alternate sitting and standing. He had postural and environmental restrictions, he needed to sit with his feet up; he experienced severe chronic pain; he had problems ambulating effectively; he could not use either foot for repetitive movements such as foot pedal controls; he could not use his left hand for simple grasping, arm controls or fine manipulation; and he had a loss of grip strength in both hands.

Pursuant to SSR 96-2p:

Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927.

The undersigned finds the ALJ did not weigh Dr. Trenbath's medical opinions using all of the factors provided in the Regulations. Substantial evidence therefore does not support the ALJ's assessment of Trenbath's opinions regarding the existence and severity of Plaintiff's impairments.

## H. Credibility

Plaintiff next argues the ALJ did not properly apply SSR 96-7p, because he did not properly consider the type, dosage, effectiveness, and side effects of medication he took to alleviate his symptoms, and other treatment he received or is receiving for relief of his symptoms. Defendant contends that Plaintiff's medications did not produce serious functional limitations.

Because the undersigned has already found the ALJ erred at the second and third steps of the sequential evaluation, it follows that substantial evidence does not support his credibility finding.

Social Security Ruling ("SSR") 96-7p and <u>Craig v. Chater</u>, 76 F.3d 585 (4th Cir. 1996) both expressly require the ALJ to take into account medications and other treatment Plaintiff has received to alleviate his symptoms. Plaintiff and his ex-wife (with whom he still lives) testified that she kept his medications and gave them to him, because he would forget. Plaintiff reported that he could not pay attention for very long and had a hard time just saying his prayers at night. He reported that he got confused trying to follow instructions, but could sometimes follow spoken instructions ok. He could sometimes finish what he started. The ALJ found Plaintiff had a mild limitation of concentration persistence or pace (R. 38). The ALJ did not discuss the side effects Plaintiff's medications might cause. The ALJ instead found Plaintiff's use of medications reflected negatively on his credibility, stating:

> The claimant testified that he has never used street drugs (no marijuana and no cocaine). But, he has taken significant amounts of narcotics for his subjective complaints of pain . . . . Dr. Trenbath was prescribing OxyContin, Valium, Paxil and a Demerol intramuscular injection as of June 23, 2000 (at the time of the prior decision) and on July 23, 2000, he noted, "narcotic use due to chronic pain, questionably excessive use." Since there are no objective tests for pain or mental status, physicians and mental health professionals must rely heavily on their patients' credibility. If all of the claimant's treating, examining and reviewing physicians and mental health professionals were fully aware of the claimant's credibility question, that undoubtedly would have impacted their opinions about his health condition.

(R. 41-42). The undersigned can not find the ALJ's opinion regarding Plaintiff's medication use is wrong; however, Plaintiff has been prescribed these medications by treating medical professionals for unquestionable injuries or impairments, such as his back and neck problems documented by medical tests. For example, as the ALJ himself notes, Plaintiff "underwent a cervical discectomy with placement of allograft and use of plates and screws for a diagnosed large left herniated disc

with intractable and severe left C6 radiculopathy." The undersigned finds it undisputable that Plaintiff had a severe neck injury with pain, and cannot find that narcotic pain medications were sought for any reason but pain. There is no indication from any physician in the record that Plaintiff was drug-seeking.

For all the above reasons, the undersigned finds substantial evidence does not support the ALJ's credibility determination.

## I. RFC

Plaintiff next argues the substantial evidence does not support the ALJ's finding for a light RFC. Defendant contends substantial evidence supports the ALJ's decision that Plaintiff could perform a limited range of light work. Because the undersigned has already found that substantial evidence did not support the ALJ's step two and step three determinations as well as his credibility determination, it follows that substantial evidence does not support his RFC determination.

## VI. RECOMMENDATION

For all the above reasons, the undersigned respectfully recommends Plaintiff's "Motion to Remand or, alternatively, Motion to Supplement Court Transcript" [Docket Entry 10] be **DENIED**; Defendant's Motion to Strike Plaintiff's Motion for Summary Judgment and Defendant's own Motion for Summary Judgment [Docket Entry 12] both be **DENIED;** Defendant's (second) Motion for Summary Judgment [Docket Entry 14] be **DENIED**; Plaintiff's Motion for Summary Judgment [Docket Entry 11] be **GRANTED IN PART** by reversing the Commissioner's decision under sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the cause to the Commissioner for further proceedings consistent and in accord with this Recommendation; and that this action be **DISMISSED and RETIRED** from the Court's docket.

Any party may, within fourteen (14) days after being served with a copy of this Report and

Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984), <u>cert. denied</u>, 467 U.S. 1208 (1984); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 27th day of January, 2011.

s/ *John S. Kaull*

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE